UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

TIMOTHY KILBOURNE,          )
          )
         Plaintiff,      )
          )
         vs.      )     No. 1:18-cv-1954-JMS-MPB
          )
CITY OF INDIANAPOLIS,       )
          )
         Defendant.    )

## ORDER

Plaintiff Timothy Kilbourne has sued his former employer, the City of Indianapolis ("the City"), alleging that his employment was unlawfully terminated as a result of his disability, his use or planned use of leave under the Family and Medical Leave Act ("FMLA"), and his filing of a worker's compensation claim. The City has filed a Motion for Summary Judgment, [Filing No. 59], which is now ripe for the Court's decision.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Failure to properly support

a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the granting of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. Hampton v. Ford Motor Co., 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. Harper v. Vigilant Ins. Co., 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. Johnson v. Cambridge Indus., 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. Nelson v. Miller, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. Darst v. Interstate Brands Corp., 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. O'Leary v. Accretive Health, Inc., 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." Johnson, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Ponsetti v. GE Pension Plan, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standards detailed above.  The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made."  *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.  Mr. Kilbourne's Employment with the City and the Residency Ordinance

City employees are subject to the City of Indianapolis – Marion County Residency Ordinance ("the Ordinance"), which requires that employees maintain their principal place of residence in Marion County.  [Filing No. 60-1 at 15; Filing No. 60-2 at 2; Filing No. 60-2 at 32.] Under the Ordinance, if an employee moves out of the county, his employment "shall terminate six months from the date that he moves his principal place of residence from the county." [Filing No. 60-2 at 32.]

At all times relevant to this litigation, Mr. Kilbourne worked for the City as a heavy equipment and vehicle mechanic in the Fleet Services Division of the Department of Public Works ("DPW").  [Filing No. 60-4 at 9-10; Filing No. 73-1 at 1.[1]]  His direct supervisor was Rick Winningham, who in turn reported to Bill Rogers, the Administrator of Fleet Services.  [Filing No. 60-4 at 40; Filing No. 73-6 at 14; Filing No. 73-8 at 2.]  Mr. Rogers reported to Tim Joyce, the Deputy Director of the DPW.  [Filing No. 60-5 at 8.]  The Director of the DPW was Dan Parker. [Filing No. 60-9 at 2.]

---

[1] Consistent with the discussion below, the Court relies upon Mr. Kilbourne's affidavit, [Filing No. 73-1], only to the extent that the statements contained therein are unchallenged by the City and do not contradict his deposition testimony.

When Mr. Kilbourne was hired by the City in 2003, he lived at 8121 Milhouse Road in Indianapolis, Indiana, ("the Milhouse Property"), which is located within Marion County.[2] [Filing No. 73-1 at 1; Filing No. 74-1 at 38.] He signed an acknowledgment form stating that he had received a copy of the Ordinance and agreed to abide by it. [Filing No. 60-2 at 32.]

**B.  The Milhouse Property**

Mr. Kilbourne purchased the Milhouse Property in 1989, and in 2006 he sold it to Ameriplex Capital Partners, LLC ("Ameriplex"). [Filing No. 60-4 at 69-73; Filing No. 73-1 at 1.] At the time of the sale, Brent Benge, the managing member of Ameriplex, signed a promissory note agreeing to pay Mr. Kilbourne and his wife, Pamela Kilbourne, a purchase price of $248,360.00, consisting of annual payments of at least $83,786.67 per year. [Filing No. 73-1 at 13-14; Filing No. 74-1 at 40.] The purchase agreement concerning the sale ("the Purchase Agreement") contained the following provision: "Complete and exclusive possession of the Property shall be delivered to Purchaser at the time of Closing; however, seller has option to live in property rent free for three years or until entire balance of purchase price is paid, whichever occurs first." [Filing No. 60-4 at 69; Filing No. 73-1 at 8.]

Shortly after the Purchase Agreement was executed, Mr. and Mrs. Kilbourne entered into a lease agreement with Ameriplex ("the Lease Agreement") to rent the Milhouse Property. [Filing No. 60-4 at 76-80; Filing No. 73-1 at 1; Filing No. 73-1 at 15-19.] The Lease Agreement did not have a specified end date or term and required the Kilbournes to pay $1 per month to lease the Milhouse Property. [Filing No. 60-4 at 76l Filing No. 73-1 at 15.] Mr. Kilbourne testified that the

---

[2] Mr. Kilbourne explained that the Milhouse Property contains two separate houses with two separate addresses, 8121 and 8111, but he always used 8121 because "that's the address that was on the mailbox." [Filing No. 74-1 at 35-36.] As used in this Order, "Milhouse Property" is intended to refer to the entire property, including both addresses.

Lease Agreement was a formality for insurance purposes and he never actually paid any rent. [Filing No. 74-1 at 43-44.]  Under a heading titled "Other Terms," the Lease Agreement states that "Lessee has option to live in Property rent free for three years or until entire balance of purchase price is paid,"[3] and references the similar provision in the Purchase Agreement.  [Filing No. 60-4 at 80; Filing No. 73-1 at 19.]

According to Mr. Kilbourne, Ameriplex became delinquent in its payments and did not pay the full purchase price by the end of the contemplated three-year period.  [Filing No. 74-1 at 45.] As a result, he continued to live rent-free on the Milhouse Property.  [Filing No. 74-1 at 46-48.] Mr. Kilbourne asserts that it was not until November 2018, after he had been terminated from his employment with the City and pursuant to a settlement agreement he signed with Ameriplex, that he finally received the remainder of the money owed to him and made arrangements to move off of the Milhouse Property.  [Filing No. 73-1 at 2; Filing No. 73-1 at 20-22; Filing No. 74-1 at 46-48.]  He maintains that he lived on the Milhouse Property continuously from 1989 until after he was terminated by the City.  [Filing No. 74-1 at 38.]

**C.  The Mooresville House**

On April 14, 2007, Mr. Kilbourne and his wife purchased a house in Mooresville, Indiana ("the Mooresville House"), which is outside of Marion County.  [Filing No. 73-1 at 1.]  At some point thereafter, Mrs. Kilbourne began living full-time in the Mooresville House.  [Filing No. 73-1 at 1-2; Filing No. 74-1 at 61.]

---

[3] This provision is hand-written and, at the end of that sentence, the phrase "whichever occurs first" appears to be crossed out.  [Filing No. 60-4 at 80; Filing No. 73-1 at 19.]

Property tax records obtained by the City show that Mr. Kilbourne claimed a homestead deduction[4] for the Mooresville House each year from 2007-2016.  [Filing No. 60-2 at 3; Filing No. 60-2 at 14-24.]  Mr. Kilbourne is the only person listed in the "Tax Payer Name" field for 2007, but the remaining years' records list both Mr. Kilbourne and Mrs. Kilbourne in that field.  [Filing No. 60-2 at 14-24.]  Mr. Kilbourne stated that, in 2017, he received mail at the Milhouse Property and did not receive any personal mail at the Mooresville House.  [Filing No. 74-1 at 50-51.]

### D.  First HR Investigation into Mr. Kilbourne's Residency

In November 2015, Tawna Ellis, the Employee Relations Manager for the City, had received information suggesting that Mr. Kilbourne was living in Mooresville and not at the Milhouse Property.  [Filing No. 73-4 at 34; Filing No. 73-4 at 46-47.]  She sent an email to Drew Carlson, a Deputy Auditor in Marion County, asking him to check property tax records to confirm whether Mr. Kilbourne lived at the Milhouse Property.  [Filing No. 73-4 at 34-35; Filing No. 73-4 at 47.]  Mr. Carlson responded in December 2015 that, according to Marion County records, Mr. Kilbourne used to own the Milhouse Property but had since sold it to Ameriplex.  [Filing No. 73-4 at 46.]  Accordingly, Mr. Carlson stated that it was possible that Mr. Kilbourne still lived at the Milhouse Property using "a rent-to-b[u]y-back arrangement or something," but, if that was the case, Mr. Kilbourne would need to prove that with a lease or "some paperwork granting him the right to live there."  [Filing No. 73-4 at 46.]  Because Mr. Carlson did not have access to the records for Morgan County, where Mooresville is located, he could not confirm whether Mr. Kilbourne paid property taxes or owned property in Mooresville.  [Filing No. 73-4 at 46.]

---

[4] Under Indiana property tax law, an individual's "homestead" is eligible for a standard deduction from the assessed value of the property.  Ind. Code § 6-1.1-12-37(b).  "Homestead" is defined as the individual's principal place of residence that meets certain other requirements.  Ind. Code § 6-1.1-12-37(a)(2).

Ms. Ellis then sent a letter to Mr. Kilbourne, dated February 29, 2016, which he received in early March of that year.  [Filing No. 73-1 at 2; Filing No. 73-1 at 23.]  The letter reiterated the requirements of the Ordinance and stated: "It has come to our attention that you moved your principal place of residence outside of Marion County and failed to inform your employer.  Based on our information you moved your permanent residence on or around August 2006."  [Filing No. 73-1 at 23.]  Mr. Kilbourne was given a deadline by which to provide proof of his permanent address, such as a lease or rental agreement, voter registration card, driver's license, or utility bill. [Filing No. 73-1 at 23.]

According to Mr. Kilbourne, in response to the letter, he took copies of his driver's license and voter registration card, as well as the Purchase Agreement and the Lease, to human resources ("HR").  [Filing No. 73-1 at 2; Filing No. 73-1 at 24-25; Filing No. 74-1 at 28.]  His driver's license and voter registration card list the Milhouse Property address.  [Filing No. 73-1 at 24-25.]  Mr. Kilbourne stated that HR accepted the documents and told him that everything was fine.  [Filing No. 73-1 at 2; Filing No. 74-1 at 28.]  Brendan Redmond, a union representative who accompanied Mr. Kilbourne on his visit to HR, confirms that the HR representative told Mr. Kilbourne that the documents he submitted were sufficient.  [Filing No. 73-5 at 8-9.]

Ms. Ellis also confirms that she presented the documents to Dan Hackler, who was the Director of HR at the time, and he determined that the documents were sufficient to prove Mr. Kilbourne's residency in Marion County.  [Filing No. 73-4 at 39-40.]  Ms. Ellis was not involved in any subsequent investigation into Mr. Kilbourne's residency.  [Filing No. 73-4 at 42-43.]

**E.  The City's Investigations into Other Employees' Residency**

Ms. Ellis testified that she recalled being involved in residency investigations concerning employees other than Mr. Kilbourne.  [Filing No. 73-4 at 6-7.]  Marva Brown was terminated for

living outside of Marion County, and she never provided her driver's license or voter registration card but instead tried to establish her residency using "a statement from a Marion County resident that she did some type of work for him to use the Marion County residence address." [Filing No. 73-4 at 8-9.] Eric Graham, who did not live inside Marion County when he was first hired, later proved his residency by submitting a driver's license and voter registration card. [Filing No. 73-4 at 19-21; Filing No. 73-4 at 45.] Finally, Lenny Addair submitted his driver's license, a letter from a property owner showing that he leased property in Marion County, and "some federal or state tax forms" to establish his residency. [Filing No. 73-4 at 28-29.] Ms. Ellis testified that driver's licenses and voter registration cards are two forms of proof that the City will ask for during residency investigations. [Filing No. 60-1 at 7.]

### F.  Mr. Kilbourne's Work-Related Injuries and Leave

Mr. Kilbourne injured his knee at work on several occasions and received worker's compensation benefits each time. [Filing No. 60-4 at 46.] Most recently, on November 14, 2016, he hurt his knee when he stepped out of a truck into a mole hole. [Filing No. 60-4 at 45.] On the day of the injury, Mr. Kilbourne and Mr. Winningham filled out reports concerning the injury and Mr. Kilbourne visited a clinic to have his knee examined. [Filing No. 73-1 at 2; Filing No. 73-1 at 26-28.] As a result of this injury, Mr. Kilbourne was required to take some time off work. [Filing No. 60-4 at 45-46; Filing No. 73-1 at 3.] Medical records related to this injury and resulting work restrictions, called "Employee Work Status Reports," were faxed to Tamella Jefferson, the City's Compensation Manager, on several occasions. [Filing No. 73-1 at 28-65; Filing No. 73-4 at 17.] In January 2017, Mr. Kilbourne was awarded retroactive worker's compensation benefits for this injury. [Filing No. 60-4 at 45-46; Filing No. 73-1 at 3; Filing No. 73-1 at 51.]

According to Mr. Kilbourne, in January 2017, he was released to do light duty or office work, but Mr. Winningham told him that no such work was available.  [Filing No. 73-1 at 3.]  Mr. Kilbourne stated that he knew such work was available, including "answering phones and in the write-up area."  [Filing No. 73-1 at 3.]  On or about January 23, 2017, Mr. Kilbourne returned to his regular job with restrictions, until he was released to work without restrictions on February 16, 2017.  [Filing No. 73-1 at 3.]

After Mr. Kilbourne returned to work, he discussed with Mr. Winningham his intention to take FMLA leave in October or November 2017 in order to have knee replacement surgery.[5] [Filing No. 60-4 at 31-32.]  Mr. Winningham recalled that Mr. Kilbourne had mentioned that he might need knee surgery and was "looking at some type of plan to get that done," but did not recall specific details of the conversation.  [Filing No. 73-6 at 9.]  Mr. Kilbourne believes that Mr. Winningham told Mr. Rogers about their conversation because Mr. Rogers is Mr. Winningham's boss.  [Filing No. 60-4 at 40.]  Mr. Winningham stated that he did not recall speaking to Mr. Rogers about Mr. Kilbourne's knee surgery plan, and he "definitely" did not speak to Mr. Joyce about it.  [Filing No. 73-6 at 10.]  According to Mr. Winningham, he did not "have any input whatsoever" in the decision to terminate Mr. Kilbourne.  [Filing No. 73-6 at 15.]

### G.  Mr. Kilbourne's First Encounter with Mr. Joyce

According to Mr. Kilbourne, approximately a week before his termination and after he had been elected to his position with the union, he met Mr. Joyce for the first time.  [Filing No. 60-4 at 42.]  Mr. Kilbourne stated that, during this meeting, Mr. Kilbourne "mentioned" that "[he] had

---

[5] Mr. Kilbourne also testified, and Mr. Winningham confirmed, that he used one day of approved FMLA leave after his father passed away.  [Filing No. 60-4 at 32; Filing No. 73-6 at 8.]  However, it is unclear from the record evidence when that leave was taken, and Mr. Kilbourne does not appear to rely on that leave as a basis for his FMLA claim.

requested FMLA to have [his] knees replaced." [Filing No. 60-4 at 42.]  Mr. Kilbourne testified

that he said to Mr. Joyce, "I'm going to be taking off around October/November to have my knees

done and I've got to go on FMLA to do that." [Filing No. 60-4 at 42-43.]  Mr. Kilbourne stated

that he did not discuss his disabilities with Mr. Joyce during this meeting. [Filing No. 60-4 at 43.]

Mr. Joyce stated in his deposition that he first met Mr. Kilbourne "a day or two before his

termination." [Filing No. 60-5 at 13.]  He stated that he was not aware that Mr. Kilbourne hurt his

knees at work or filed a worker's compensation claim. [Filing No. 60-5 at 14.]  In his supplemental

affidavit, Mr. Joyce clarified that he met Mr. Kilbourne a day or two before his termination, and

the "meeting was limited to introductions and lasted a few minutes." [Filing No. 60-8 at 2.]

According to Mr. Joyce, Mr. Kilbourne did not mention any issues with his knees or planned

FMLA leave. [Filing No. 60-8 at 2.]  Mr. Joyce averred that, at the time of the investigation into

Mr. Kilbourne's residency, Mr. Joyce was not aware of any disability, any accommodation

requested or received, any injuries he may have suffered on the job, any worker's compensation

claim, or any FMLA leave that he had taken or planned to take. [Filing No. 60-8 at 2-3.]

### H.  Second HR Investigation into Mr. Kilbourne's Residency

On August 28 or 29, 2017, Shawn Bryant, an HR Consultant for the City, "received several

anonymous calls stating that [Mr.] Kilbourne's residence was not in Marion County and that his

actual residence" was located in Mooresville. [Filing No. 60-2 at 3.]  Mr. Kilbourne's employment

records reflected that his address was the Milhouse Property.[6] [Filing No. 60-2 at 3.]  Mr. Bryant

checked the property tax records for the Mooresville House and discovered that Mr. Kilbourne had

been claiming a homestead deduction on that property since 2007. [Filing No. 60-2 at 3.]

---

[6] In his affidavit, Mr. Bryant stated that the address on file for Mr. Kilbourne was 8181 Milhouse
Road, although the City clarified in its reply that 8181 was a scrivener's error and Mr. Bryant was
referring to the Milhouse Property. [Filing No. 76 at 1.]

According to Mr. Bryant, the HR department checks homestead records because it is his belief that "the exemption may only be claimed for the 'individual's principal place of residence' under Indiana Code 6-1.1-12-37(2)." [Filing No. 60-2 at 3.]

Mr. Bryant and a co-worker visited the Milhouse Property and observed that it "appeared to be vacant and in a dilapidated state." [Filing No. 60-2 at 4.] They did not enter because a "No Trespassing" sign was posted. [Filing No. 60-2 at 4.] However, Mr. Bryant took photographs, which he opines show "the property in a state of disrepair," including "significant overgrowth of the lawn and vegetation" that is "engulfing the house." [Filing No. 60-2 at 4.] Mr. Bryant then checked records from the Department of Business and Neighborhood Services ("BNS"), which state that the Milhouse Property is owned by Ameriplex and the "house [is] vacant but people go in and out." [Filing No. 60-2 at 4; Filing No. 60-2 at 28.] Mr. Bryant interpreted these records to mean that "nearby neighbors had submitted complaints to the City that the Milhouse Road property was vacant and that vagrants frequented the house." [Filing No. 60-2 at 4.] Based on his investigation, Mr. Bryant concluded that Mr. Kilbourne did not live in Marion County. [Filing No. 60-2 at 5.]

Mr. Bryant brought his conclusion and the information he had collected to the attention of the current Director of Human Resources, Monica Lockard.[7] [Filing No. 60-2 at 5; Filing No. 61-1 at 23.] According to Ms. Lockard, Mr. Bryant showed her the evidence he had collected, including the photographs, and she agreed with his statement that "there was a barricade [on the Milhouse Property] and he could not even get up on the property and that the roof looked like it had fallen in and that no one resided there." [Filing No. 61-1 at 24-25; Filing No. 61-1 at 34-35.]

---

[7] Ms. Lockard has since changed her last name to Payne. [Filing No. 61-1 at 5.] In the interest of consistency, the Court will refer to her as Ms. Lockard.

She believed that there were no utilities running to the Milhouse Property.  [Filing No. 61-1 at 35.]

Ms. Lockard recalled reviewing property tax records for the Mooresville House and that both Mr.

Kilbourne and his wife "were on [the tax documents] as primary residents."  [Filing No. 61-1 at

29-30.]  She testified that the City can access tax documents because they are public records.

[Filing No. 61-1 at 32.]  She did not consult with anyone in the City's legal department regarding

whether it was possible for a married couple to claim a homestead exemption if only one spouse

lives on the claimed property.  [Filing No. 61-1 at 30.]  However, she consulted with the City's

corporation counsel, as well as Mr. Joyce and Mr. Parker, regarding the termination prior to

making any decision.  [Filing No. 61-1 at 33.]  According to Ms. Lockard, during that conference,

"[t]he decision was made that [based on] the information that was provided, we could substantiate

no one resided in that home or that residence . . . and that we would question Mr. Kilbourne about

that, and then if . . . there wasn't, you know, a justifiable rebuttal and he continued to assert he

lived there, we would move forward with the separation."  [Filing No. 61-1 at 34.]  A meeting with

Mr. Kilbourne was scheduled for the following day.  [Filing No. 60-2 at 5.]

### I.  Mr. Kilbourne's Termination

On August 30, 2017, Mr. Bryant, Ms. Lockard, Mr. Joyce, and Mr. Rogers met with Mr.

Kilbourne, and Mr. Redmond was present as a union representative.  [Filing No. 60-2 at 5; Filing

No. 74-1 at 20.]  Mr. Bryant presented to Mr. Kilbourne the results of the investigation—including

the photographs, the tax records, and the BNS records—and gave him the opportunity to respond.

[Filing No. 60-2 at 5.]  According to Mr. Bryant, Mr. Kilbourne "insisted that he lived in Marion

County" and presented the Lease Agreement as evidence.  [Filing No. 60-2 at 5.]

According to Ms. Lockard, she asked Mr. Kilbourne to take her to the Milhouse Property

to prove that he lived there.  [Filing No. 61-1 at 38-39.]  Ms. Lockard testified that, "when [she]

said let's go now, Mr. Kilbourne then made a call, he left the building, and then [she] said well, let's go, and he said he did not have the keys, and then [she] said we're ending this now and your employment has been ended." [Filing No. 61-1 at 39.] Ms. Lockard stated that she did not allow Mr. Kilbourne to obtain the keys or take her to the Milhouse Property at a later time because she felt there was enough evidence to substantiate that Mr. Kilbourne did not live at the Milhouse Property. [Filing No. 61-1 at 40.] Mr. Bryant also recalled that, when asked to visit the Milhouse Property, Mr. Kilbourne "stated that he did not have a key to the house." [Filing No. 60-2 at 6.]

Mr. Kilbourne testified that he told Ms. Lockard that he still lived at the Milhouse Property, and she was insisting that he take her there and unlock the door. [Filing No. 60-4 at 16.] He stated that he tried to explain to her that he did not live in the house, but instead lived in a motorhome that he parked behind or in the barn, and she then changed her mind about visiting the property and decided to go forward with the termination. [Filing No. 60-4 at 16.] He tried to explain that, at the time of the meeting, he did not have the keys to the house on the Milhouse Property because the keys were inside his motorhome, which his wife was currently taking to be filled with gas. [Filing No. 74-1 at 22-24.] Mr. Kilbourne said that he was attempting to get in contact with his wife to have her meet him at the Milhouse Property when Ms. Lockard decided to go ahead with the termination. [Filing No. 74-1 at 22.]

Regarding the City's other evidence, Mr. Kilbourne stated that there was no electricity running to the Milhouse Property because he used a generator to power his motorhome. [Filing No. 60-4 at 19.] He said the overgrowth "was there when [he] moved there" and he let trees grow along the fence line to block light from the highway and to serve as a "naturescape." [Filing No. 60-4 at 19.] As to the BNS records, Mr. Kilbourne stated that he was "having problems with [his] neighbors breaking into that house, and they kept saying that [he] didn't live there, and that was an

ongoing problem." [Filing No. 60-4 at 20.]  Mr. Kilbourne was terminated at the conclusion of the meeting. [Filing No. 60-2 at 6.]

### J.  Mr. Kilbourne's Post-Termination Grievance

On September 12, 2017, Mr. Kilbourne filed a grievance related to his termination. [Filing No. 60-2 at 6; Filing No. 74-1 at 90-93.]  In his statement accompanying the grievance, Mr. Kilbourne maintained that he lived in Marion County for the duration of his employment. [Filing No. 74-1 at 91.]  He stated that, although he owned a house in Mooresville and claimed a homestead deduction related to that house, he leased property in Marion County. [Filing No. 74-1 at 91.]  He stated that he had proved his residence in 2016 and stated that he was submitting the documents he relied upon then, as well as additional documents, proving that he lived in Marion County. [Filing No. 74-1 at 91.]

A hearing on the grievance was held on September 27, 2017. [Filing No. 74-1 at 93.]  The Determination Statement concerning the grievance states that the City presented property tax records for the Mooresville House, and notes that "Indiana Code states that in order for property to be eligible for the homestead deduction, the property must serve as the primary residen[ce] of the owner." [Filing No. 74-1 at 93.]  The Determination Statement also notes that the photographs of the Milhouse Property and the BNS records suggested that the Milhouse Property was likely vacant. [Filing No. 74-1 at 93.]  As to Mr. Bryant's evidence, the Determination Statement reads:

> The documentation provided by Mr. Kilbourne to prove his residency is based off the State of Indiana Bureau of Motor Vehicles acceptable list to establish residency in the State of Indiana and not necessarily specifically to county.  The addresses for bills, bank statements and most other pieces of mail can be listed to any address and provided to the Bureau of Motor Vehicles to satisfy the requirement of being an Indiana resident for a license and vehicle registrations.  The [electricity] and Citizens Gas bills provided were dated in the years 2008, 2009, 2012, and one month in 2016 (that is not even addressed to the 8121 Milhouse Road residence) indicating that no ongoing services were being delivered and paid for consistently and no bills were produced for any months in 2017.  The lease he

provided is still the same expired lease from 2006 with no updated addendums and the second mortgage shared was also dated in 2006.

While Mr. Kilbourne may have shown the State to be an Indiana Resident, the preponderance of the evidence provided by the city shows that he is a resident of Morgan County.  Thusly, he is in violation of the City-County Ordinance that employees must reside within Marion County, unless they possess a waiver.  Mr. Kilbourne does not possess such a waiver.  Therefore, it is recommended that the termination stands and for the grievance to be DENIED.

[Filing No. 74-1 at 93.]

### K.  Mr. Kilbourne's Replacement

Fidel Vega was hired by Mr. Winningham to replace Mr. Kilbourne.  [Filing No. 73-6 at 15.]  Mr. Vega has not requested or taken FMLA leave and the City "does not have any ADA-related records for Fidel Vega."  [Filing No. 73-8 at 3.]

### L.  Other Relevant Testimony from City Employees

Mr. Rogers signed the paperwork for Mr. Kilbourne's termination.  [Filing No. 60-6 at 23.] However, he testified that "[t]he decision to terminate Tim Kilbourne was an HR decision" and he was not involved in making it, nor was he consulted.  [Filing No. 60-6 at 16.]  He stated that he found out about the termination the day before it occurred and could not have stopped it.  [Filing No. 60-6 at 16-17; Filing No. 60-6 at 24.]  However, Mr. Rogers opined that "the evidence presented was pretty damaging."  [Filing No. 60-6 at 21-22; Filing No. 60-6 at 24.]  Regarding the termination letter, he stated, "As the administrator, I had to sign that form.  It's just part of that process."  [Filing No. 60-6 at 17.]  Mr. Rogers also testified that if one of his employees was absent from work due to being on FMLA leave of for some other reason, he would know about it at the time because he is regularly provided with a list of unavailable or absent employees.  [Filing No. 73-7 at 7-8.]

Mr. Parker averred that he has never met Mr. Kilbourne and was first informed of the investigation into Mr. Kilbourne's residency on August 29, 2017, the day before his termination.

[Filing No. 60-9 at 2.] Mr. Parker stated that, at the time of the investigation, he did not have any knowledge of any disability Mr. Kilbourne may have had, any accommodations he may have requested or received, any injuries he may have suffered while on the job, any worker's compensation claims he may have made, or any FMLA leave he had taken or planned to take. [Filing No. 60-9 at 2-3.]

According to Mr. Joyce, at the August 29 meeting, no one discussed Mr. Kilbourne's age, FMLA leave, worker's compensation claim, injury, or disability. [Filing No. 60-5 at 26.] He stated that none of these things factored into the decision to terminate Mr. Kilbourne, which was based only on his residency. [Filing No. 60-5 at 26.] In his supplemental affidavit, Mr. Joyce averred that, at the time of the investigation into Mr. Kilbourne's residency, Mr. Joyce was not aware of any disability Mr. Kilbourne may have had, any accommodation requested or received, any injuries he may have suffered on the job, any worker's compensation claim, or any FMLA leave that he had taken or planned to take. [Filing No. 60-8 at 2-3.]

Ms. Lockard testified that she met Mr. Kilbourne once prior to his termination, at a healthcare committee meeting. [Filing No. 61-1 at 20-21.] According to Ms. Lockard, Mr. Kilbourne "was introduced as being newly elected into the fleet [union] role," and that was the extent of their conversation. [Filing No. 61-1 at 21.] Ms. Lockard stated that she was not aware that Mr. Kilbourne had injured his knee at work or filed a worker's compensation claim, and she did not know that he took short-term disability leave. [Filing No. 61-1 at 21-22.]

Mr. Bryant stated that, throughout the investigation, he had no knowledge of any past, present, or planned use of FMLA leave by Mr. Kilbourne, any workplace injury or worker's compensation benefits received by Mr. Kilbourne, any disabilities, or any reasonable accommodations provided to Mr. Kilbourne. [Filing No. 60-2 at 6-7.] Mr. Bryant stated that the

16

investigation into Mr. Kilbourne's residency was the only residency investigation that Mr. Bryant

had been involved in where: (1) the employee claimed a homestead exemption on a property

outside of Marion County; (2) there was evidence that the address in Marion County claimed by

the employee was vacant; and (3) the employee insisted that he lived in Marion County, despite

the evidence.  [Filing No. 60-2 at 6.]

### III.
### DISCUSSION

#### A. Abandoned Claims

In his Amended Complaint, Mr. Kilbourne asserted the following claims against the City:[8]

- Count I: Age Discrimination

- Count II: Violations of the Americans with Disabilities Act ("ADA")

- Count III: Retaliation under the First Amendment

- Count IV: "Unconstitutional Interference with [the] Right to Freedom of Association in Violation of 42 U.S.C. § 1983"

- Count IV:[9] Violations of the FMLA

- Count V: Retaliatory Discharge in Violation of Indiana Common Law ("*Frampton*[10] claim")

[Filing No. 14.]

Pursuant to the Case Management Plan ("CMP"), the party with the burden of proof was

required to "file a statement of the claims or defenses it intends to prove at trial, stating specifically

---

[8] Mr. Kilbourne also named other Defendants who have since been voluntarily dismissed from this action.  [*See* Filing No. 54.]

[9] The Amended Complaint contains two claims titled "Count IV."  [Filing No. 14 at 9-10.]

[10] *Frampton v. Cent. Indiana Gas Co.*, 297 N.E.2d 425 (Ind. 1973) (establishing a cause of action for retaliatory discharge for filing a worker's compensation claim).

the legal theories upon which the claims or defenses are based." [Filing No. 34 at 5.]   Mr.

Kilbourne filed a Statement of Claims, defining his claims as follows:

> Plaintiff filed his lawsuit against Defendant, The City of Indianapolis, for
> unlawfully violating his rights protected by the Age Discrimination in Employment
> Act of 1967 (hereinafter "ADEA"), 29 U.S.C. § 621, et. seq., the Americans with
> Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12101 et seq., the First
> Amendment to the United States Constitution, the Family and Medical Leave Act
> ("FMLA"), 29 U.S.C. § 2601 et seq., and Indiana Law. He contends that the City
> of Indianapolis discriminated against him on the basis of his age and/or
> disability(s), and/or retaliated against him due to his protected speech and
> association, and/or because he requested and took leave under the FMLA and/or
> because he requested workers' compensation benefits.

[Filing No. 55 at 1.]

The City then filed its Motion for Summary Judgment, noting in its opening brief that the

Statement of Claims "did not clarify which claims and legal theories [Mr. Kilbourne] intends to

pursue" and his "vague, kitchen sink strategy" made it difficult to determine which issues should

be briefed.  [Filing No. 62 at 1-2.]  Accordingly, the City attempted to address all of the numerous

potential issues involved in this case and reserved the right to address in its reply any issues that

Mr. Kilbourne more clearly defined in his response brief.  [See Filing No. 62.]

Mr. Kilbourne responds that "this case involves one main issue: whether Defendant

terminated Kilbourne's employment for unlawful reasons: because he was disabled, because he

had engaged in activity protected by the ADA, because he had requested leave under the FMLA,

and/or becuase [sic] he filed a workers' compensation claim against the City."  [Filing No. 75 at

1.]  In a footnote, he clarifies that he is proceeding only on "Count II (ADA Violations), Count IV

(FMLA Violations), and Count V (Frampton claim)," while abandoning the rest of his claims.

[Filing No. 75 at 1 n.1.]

Based on Mr. Kilbourne's concession, the City's Motion for Summary Judgment is

**GRANTED** as to the abandoned claims under the Age Discrimination in Employment Act, the

First Amendment, and § 1983.  And, although Mr. Kilbourne was less than explicit about defining his remaining claims, the Court concludes based on his briefing that Mr. Kilbourne is pursuing the following causes of action: (1) retaliation under the FMLA; (2) retaliation under the ADA; (3) discrimination under the ADA based on disparate treatment; and (4) a *Frampton* retaliatory discharge claim under Indiana law.  [*See* Filing No. 75 at 11 ("Plaintiff makes claims against Defendant for disability discrimination and retaliation, and FMLA retaliation."); Filing No. 75 at 13 (noting, in relation to the ADA claims, that "Kilbourne contends that Defendant enforced its job expectations unequally"); *but see* Filing No. 75 at 1 n.1 (stating that Mr. Kilbourne intends to pursue claims for "Violations" of the ADA and FMLA).]

As a final note, Mr. Kilbourne's Statement of Claims was woefully inadequate and failed to comply with both the letter and the spirit of the CMP, which is a binding Order of this Court. Specifically, the requirement that parties file statements of their claims and defenses is intended to clarify and focus the issues for summary judgment and for trial, in order to avoid wasting time on issues that will not be pursued and ensure that the claims that are going forward can be addressed and disposed of in the most efficient manner possible.  That requirement was disregarded here, without any apparent justification, resulting in the City and its counsel having to expend time and resources addressing issues in drafting its Motion for Summary Judgment, only for the same issues to be immediately abandoned by Mr. Kilbourne in his response.  Mr. Kilbourne's counsel is admonished that such a practice is not helpful nor acceptable, and is warned that any future failure to comply with Orders of this Court, including the CMP, could result in liability for attorneys' fees and costs under 28 U.S.C. § 1927 or sanctions under Federal Rules of Civil Procedure 11 and 37.

### B.  Mr. Kilbourne's Supplemental Affidavit

Along with his response to the City's Summary Judgment Motion, Mr. Kilbourne submitted his own supplemental affidavit.  [Filing No. 73-1.]  The City takes issue with this affidavit, arguing that it "is inaccurate and contradicts [Mr. Kilbourne's] deposition testimony in a number of respects" and pointing to three specific purported contradictions.  [Filing No. 76 at 5-6.]  The City asserts that the Court should disregard these three statements.  [Filing No. 76 at 5-6.]

"The principal function of summary judgment is to prevent unnecessary trials by screening out factually unsupported claims," and Rule 56 requires the Court "to scrutinize the substance of an affidavit offered in response to a summary-judgment motion to determine whether a reasonable jury could rely on the factual statements it contains."  *James v. Hale*, --- F.3d.---, 2020 WL 2487603, *5 (7th Cir. May 14, 2020) (citations omitted).  To that end, "the sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony."  *Id.* (citation omitted).  The rationale for this rule is simple: "a *genuine* issue of material fact cannot be conjured out of nothing."  *Id.* (emphasis in original).  However, there are three notable exceptions to the rule, and a court may rely upon a supplemental affidavit that contradicts prior testimony if: (1) the affidavit is based on newly discovered evidence; (2) the prior testimony is demonstrably mistaken; or (3) the affidavit clarifies ambiguous or confusing deposition testimony.  *Id.* at *7; *see also Howell v. Smith*, 853 F.3d 892, 900 (7th Cir. 2017) ("Although a party may attempt to clarify or augment (but not contradict) prior deposition testimony through affidavits, [c]ourts generally ignore attempts to patch-up potentially damaging deposition testimony with a supplemental affidavit unless the party offers a suitable explanation— e.g., confusion, mistake or lapse in memory—for the discrepancy." (internal quotations and citations omitted) (alteration in original)).

### 1. Statement Concerning Homestead Exemption

First, the City asserts that Mr. Kilbourne suggests in his affidavit that he was legally required to include himself on the homestead credit paperwork for the Mooresville House because his wife lived there, while he testified in his deposition that, when he purchased the Mooresville House, he planned to either give it to his son or "flip it." [Filing No. 76 at 5 (comparing Filing No. 73-1 with Filing No. 60-4 at 20).]

Mr. Kilbourne's deposition testimony reflects that he was asked to review Mr. Redmond's report concerning the termination meeting. [*See* Filing No. 60-4 at 16-20.] While reading that report, and apparently in reference to the Mooresville House, Mr. Kilbourne stated: "What it says that I stated, put the -- in my son's name. At the time we bought that house, we didn't know if we was going to give it to my son or flip it, is what I said. We've helped all my kids get houses, so..." [Filing No. 60-4 at 20.] In that same discussion, Mr. Kilbourne stated that the report was not an accurate account of the meeting. [Filing No. 60-4 at 18.]

As relevant here, the affidavit reads: "On March 10, 2008, after my wife began living in Mooresville, we filed a homestead exemption on the property, as it was the only property we owned and was my wife's principal place of residence." [Filing No. 73-1 at 1-2.]

The Court does not find that Mr. Kilbourne's affidavit contradicts his deposition testimony on this issue. Specifically, the fact that his wife eventually began living in the Mooresville House does not necessarily contradict the fact that the Kilbournes may have purchased the house with the intention to give it to their son or to "flip it." It is not disputed that Mrs. Kilbourne ultimately began living in the Mooresville House. Regardless, Mr. Kilbourne's deposition testimony does not clarify whether the statement in Mr. Redmond's report concerning his initial intention in purchasing the house was accurate. And finally, as discussed further below, the question of

21

whether Mr. Kilbourne was in fact legally required to list himself on the homestead exemption for the Mooresville House need not be resolved in order to dispose of his claims. In other words, to the extent that there is a discrepancy between the deposition and the affidavit, it does not concern an issue of material fact. Accordingly, the Court need not disregard this portion of the affidavit.

### 2. *Statement Concerning Mr. Kilbourne's First Encounter with Mr. Joyce*

Second, the City notes that Mr. Kilbourne states in his affidavit that, when he met Mr. Joyce around August 23, 2017, he told Mr. Joyce that he intended to work until 2023, that his knees were bad because he had injured them at work in November 2016, and that he had returned to work in February 2017. [Filing No. 76 at 5.] The City argues that the Court should not consider those statements because Mr. Kilbourne did not mention them in his deposition while testifying about his initial meeting with Mr. Joyce. [Filing No. 76 at 5 (comparing Filing No. 73-1 at 3 with Filing No. 60-4).]

The Court agrees that Mr. Kilbourne, through his affidavit, has attempted to embellish his deposition testimony on this issue. In his deposition, Mr. Kilbourne stated the he mentioned to Mr. Joyce his plan to take FMLA leave to have his knees replaced, but he did not include in his testimony that he told Mr. Joyce about his on-the-job knee injury or resulting leave. [Filing No. 60-4 at 42-43.] In addition, he explicitly testified that he did not discuss his disabilities with Mr. Joyce. [Filing No. 60-4 at 43.] Accordingly, to the extent that Mr. Kilbourne's affidavit references subjects that were not included in his deposition testimony—namely, his intention to work until 2023, his November 2016 injury, and the resulting leave—the Court will disregard those references.

   *3.   Statement Concerning the Keys to the House on the Milhouse Property*

Finally, the City asserts that Mr. Kilbourne used the affidavit to modify his deposition testimony concerning the keys to house on the Milhouse Property.   [Filing No. 76 at 6.] Specifically, the City points out, the affidavit states:

> Lockard asked me to take her to the property, and open the door to the house, which I did not live in. At the time, my wife had the keys to one of the houses at 8121 Milhouse. I told Lockard this, but that I could show her the motor home in which I lived. She decided not to visit the property, but to move ahead with my termination.

[Filing No. 76 at 6 (citing Filing No. 73-1 at 3).]   Mr. Kilbourne's deposition testimony, however, was as follows:

> A: The keys, what I was referring to is my wife had taken the motor home to get gas in it, and I was trying to get ahold of her, and I never said that -- was alluding to that I couldn't let her in the house. I have the keys to the house. And she just wanted me to open the door on the house which I was going to do.
>
> Q: So you had the keys to the house?
>
> A: No, they was in the motor home. And that's what I was trying to tell them, that I was trying to get ahold of my wife. And never did I tell Monica that I couldn't show her that, I was just trying to get ahold of my wife to meet us back there.
>
> . . .
>
> Q: Did you have the keys for 8121 at the time that –
>
> A: They was in the motor home.
>
> Q: And you didn't have the motor home at that time either?
>
> A: Huh-uh, my wife took it to go get filled.

[Filing No. 76 at 6 (citing Filing No. 60-4 at 21-23).]   The City asserts that Mr. Kilbourne's declaration "omits the fact that the keys to the house were in the motor home and the motor home was gone precisely during the termination meeting."   [Filing No. 76 at 6.]

The Court agrees that, on this point, Mr. Kilbourne's affidavit contradicts his deposition testimony and he has offered no justification for the contradiction. Accordingly, the Court will disregard this portion of the affidavit and rely upon the deposition testimony as to this issue.

### C.  Federal Claims

The City makes essentially the same argument as to each of Mr. Kilbourne's federal claims: there is no evidence showing that Mr. Kilbourne's disability, request for accommodation, or exercise of rights under the FMLA caused his termination. [Filing No. 62 at 11-13.] Specifically, the City asserts, Mr. Kilbourne has not presented any evidence that any of the decisionmakers involved in his termination were aware of his disability, request for accommodation, or planned FMLA leave, and the record evidence does not show any discriminatory basis for the HR investigation into his residence. [Filing No. 62 at 11-13.] The City further argues that, under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Mr. Kilbourne's claims fail because: (1) the City has identified a legitimate, non-discriminatory reason for the termination, specifically, violation of the Ordinance; (2) Mr. Kilbourne has identified no similarly-situated comparators whose employment was not terminated under similar circumstances; and (3) he cannot establish that the offered reason for his termination was pretext. [Filing No. 62 at 13-16.]

Mr. Kilbourne responds that, under the ADA, he was a qualified individual with a disability caused by his knee injuries and the City "does not designate any evidence to support or argue" otherwise. [Filing No. 75 at 14-15.] He also asserts that, by informing Mr. Winningham and Mr. Joyce of his intent to take FMLA leave to have knee replacement surgery, he put the City on notice that he planned to take FMLA leave, and his request for leave also constituted a request for an

accommodation under the ADA.[11]   [Filing No. 75 at 15.]   Mr. Kilbourne argues that factual issues

remain as to whether Mr. Joyce or Ms. Lockard had knowledge of Mr. Kilbourne's disability,

request for accommodation, or intention to take FMLA leave.   [Filing No. 75 at 16.]   As to Ms.

Lockard specifically, Mr. Kilbourne argues that a reasonable jury could conclude that she had

knowledge of these matters based on her role as Director of HR and the fact that records related to

his knee injury and worker's compensation claim had been submitted to the HR department.

[Filing No. 75 at 16.]   Mr. Kilbourne also asserts that there is no dispute that Mr. Rogers knew of

the knee injury and resulting leave.   [Filing No. 75 at 16-17.]   In addition, Mr. Kilbourne argues

that issues of fact remain as to whether the City terminated him for unlawful reasons because he

has presented circumstantial evidence from which a jury could infer that he was terminated because

of his disability, request for accommodation, or planned FMLA leave.   [Filing No. 75 at 17-22.]

Specifically, Mr. Kilbourne points out that: (1) he was terminated a week after telling Mr. Joyce

about his intention to take leave for knee surgery, which is "highly suspect and worthy of an

automatic inference of causation"; (2) he presented evidence of ambiguous statements, specifically

that his driver's license and voter registration card were sufficient to demonstrate his residence in

March 2016 but the same evidence was deemed insufficient in August 2017; (3) the City violated

Indiana law in obtaining the homestead deduction records, which are confidential; (4) in any event,

the homestead records do not demonstrate that Mr. Kilbourne lived at the Mooresville House,

given that his wife lived there; (5) the evidence relied upon by the City in terminating Mr.

Kilbourne—such as photographs of the house on the Milhouse Property or the fact that the houses

---

[11] Mr. Kilbourne also asserts that his "request to be put on light duty" constituted a request for a
reasonable accommodation under the ADA, [Filing No. 75 at 15], but he does not mention such
request again in his brief or develop his discrimination or retaliation arguments as to this issue,
and therefore such arguments are waived.  *See, e.g.*, *Kochert v. Adagen Med. Int'l, Inc.*, 491 F.3d
674, 679 (7th Cir. 2007) (explaining that "undeveloped arguments are waived").

on the property were vacant—was irrelevant because Mr. Kilbourne lived in a motor home, not either of the houses; (6) other employees—including Mr. Graham, Mr. Addair, and Ms. Brown— were asked to establish their residency using only driver's licenses and voter registration cards; and (7) Mr. Vega, who replaced Mr. Kilbourne, was not disabled and had never used FMLA leave. [Filing No. 75 at 18-22.]  For the same reasons, Mr. Kilbourne argues, he has shown that the City's purported reason for terminating him is pretext.  [Filing No. 75 at 22-25.]

In reply, the City maintains that Mr. Kilbourne has not identified any similarly situated comparators, because he has not shown that the individuals he mentioned were similarly situated. [Filing No. 76 at 7-9.]  The City argues that the timing of Mr. Kilbourne's termination is not sufficient to create a triable issue of fact because he has not presented evidence that either Mr. Parker or Ms. Lockard knew about the disability or planned FMLA leave and, even if Mr. Joyce knew about those things, a significant intervening event—the residency investigation—occurred between Mr. Kilbourne's conversation with Mr. Joyce and his termination.  [Filing No. 76 at 9-10.]  In addition, even though Mr. Winningham and Mr. Rogers may have been aware of Mr. Kilbourne's knee problems, there is no evidence connecting them to the termination decision. [Filing No. 76 at 10.]  Finally, the City argues that even if the evidence was ambiguous as to whether Mr. Kilbourne lived within Marion County, the City employees were entitled to use their judgment and Mr. Kilbourne has presented no evidence upon which a jury could conclude that the decisionmakers were lying as to their reason for terminating him.  [Filing No. 76 at 11.]

"The [FMLA] and the [ADA] are legally distinct, but in cases claiming unlawful retaliation, the analyses under the two separate acts overlap." *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 900 (7th Cir. 2018).  Both statutes prohibit employers from retaliating against employees who assert their statutory rights. *Id.* (citing 29 U.S.C. § 2615; 42 U.S.C. § 12203).  "Retaliation

claims under the FMLA and ADA require three familiar elements: (1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action." *Freelain*, 888 F.3d at 901.  Here, the City does not dispute Mr. Kilbourne's assertion that his informal notice of intent to take FMLA leave in the future constitutes protected activity under the FMLA or the ADA, so the Court assumes for purposes of this motion that the notice constitutes protected activity under both statutes.  The parties also do not dispute that Mr. Kilbourne's termination constitutes an adverse employment action, and the only element at issue is causation.

Similarly, causation is at issue with respect to Mr. Kilbourne's ADA discrimination claim. "A claim for disparate treatment based on disability under the ADA . . . requires proof [that] (1) plaintiff was disabled; (2) plaintiff was qualified to perform essential functions with or without reasonable accommodation; and (3) disability was the 'but for' cause of adverse employment action." *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019) (emphasis omitted).  Again, neither party has meaningfully addressed whether Mr. Kilbourne's knee problems rendered him disabled or whether he was qualified to perform the essential functions of his job, so the Court assumes for purposes of this motion that these first two elements are satisfied.

Accordingly, the question is whether there is a genuine dispute of material fact as to whether Mr. Kilbourne's disability or request for FMLA leave caused his termination.  "In deciding that question, [the Court] consider[s] the evidence as a whole and ask[s] whether a reasonable jury could draw an inference of retaliation" or discrimination.  *King v. Ford Motor Co.*, 872 F.3d 833, 841-42 (7th Cir. 2017) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764-66 (7th Cir. 2016)).  Although the *McDonnell Douglas* framework may be a useful tool to help a plaintiff "clarify and simplify" the task of demonstrating that the evidence presented creates a reasonable inference of

27

discrimination, it is not the only way to do so, and "'the sole question that matters' is causation: whether a statutorily proscribed factor caused [the adverse employment action]." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020) (quoting *Ortiz*, 834 F.3d at 764-65)).[12]

To show that discrimination or retaliation was the "but for" cause of an adverse employment action, a plaintiff can point to direct evidence, such as an admission, or to circumstantial evidence, which includes: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 802 (7th Cir. 2018) (quoting *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017)).

In order to show pretext, "[a] plaintiff must point to evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the termination." *Tibbs v. Admin. Office of the Ill. Courts*, 860 F.3d 502, 506 (7th Cir. 2017) (internal quotations and citations omitted). "Merely disagreeing with an employer's reasons does not meet this standard." *Id.* A finding of pretext "concerns whether the stated reason was not merely erroneous or unfair, but a lie." *King*, 872 F.3d at 843.

The Court will begin analysis of the causation and pretext issues with a brief discussion of the decisionmakers and their knowledge. The City employees that were involved in Mr.

---

[12] Although *Ortiz* and *Joll* involved discrimination under Title VII, the Seventh Circuit has repeatedly instructed that the same principles apply at the summary judgment stage to claims under the ADA and FMLA. *See, e.g.*, *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004) ("We evaluate a claim of FMLA retaliation the same way that we would evaluate a claim of retaliation under other employment statutes, such as the ADA or Title VII.").

Kilbourne's termination as decisionmakers or who consulted with decisionmakers are Mr. Bryant, Ms. Lockard, Mr. Rogers, Mr. Joyce, and Mr. Parker.  All of these people, except Mr. Rogers, testified that they had no knowledge of Mr. Kilbourne's knee problems, requests for accommodations, prior injuries, or intent to take FMLA leave.  [Filing No. 60-2 at 6-7; Filing No. 60-8 at 2-3; Filing No. 60-9 at 2-3; Filing No. 61-1 at 21-22.]  Despite these assertions, viewing the facts in the light most favorable to Mr. Kilbourne and drawing all reasonable inferences in his favor as the Court must do at this stage, a reasonable factfinder could conclude that some or all of these individuals knew about these matters.  Specifically, there is evidence to show that: (1) the HR Department handled and had records of Mr. Kilbourne's 2016 knee injury, resulting leave, and related worker's compensation claim; (2) Mr. Winningham, a direct subordinate who reported to Mr. Rogers, knew about the knee injury and was told of Mr. Kilbourne's intention to take FMLA leave; and (3) Mr. Kilbourne informed Mr. Joyce of his intention to take FMLA leave for knee replacement surgery.  On these facts, a reasonable factfinder could conclude that Mr. Bryant or Ms. Lockard, as HR employees, viewed Mr. Kilbourne's records, or that Mr. Rogers or Mr. Joyce at some point informed the group of these matters.  Essentially, whether any decisionmaker was aware of any of these things is a question of whose testimony is to be believed, and that issue is reserved solely for the factfinder.

However, even if it is assumed that the decisionmakers knew about Mr. Kilbourne's disability, injuries, and intent to take FMLA leave, knowledge does not equate to causation.  In an attempt to show that there is evidence from which a reasonable factfinder could infer discriminatory or retaliatory intent, Mr. Kilbourne first points to allegedly suspicious timing. "[S]uspicious timing by itself rarely is enough to overcome summary judgment." *Lutes v. United Trailers, Inc.*, 950 F.3d 359, 369 (7th Cir. 2020).  Furthermore, the Seventh Circuit has made clear

that engaging in protected activity does not immunize an employee from being disciplined for his workplace behavior, and "where a 'significant intervening event separat[es]' an employee's protected activity from the adverse employment action he receives, a suspicious-timing argument will not prevail." *Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012) (quoting *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 675 (7th Cir. 2011)) (alteration in original).

Here, the only event close in time to Mr. Kilbourne's termination was his conversation with Mr. Joyce that occurred a week earlier. The rest of the relevant events—his November 2016 knee injury, the following short-term disability leave, and the resulting award of worker's compensation benefits in January 2016—occurred more than six months prior to the residency investigation and termination. There are two problems with Mr. Kilbourne's argument that short time between his conversation with Mr. Joyce and his termination creates an inference of discriminatory or retaliatory intent. First, Mr. Joyce did not initiate the investigation into Mr. Kilbourne's residency; Mr. Bryant did. And Mr. Kilbourne has presented no evidence from which a reasonable factfinder could conclude that Mr. Bryant was aware of or in any way influenced by the conversation between Mr. Kilbourne and Mr. Joyce. And, even though Mr. Bryant may have had access to Mr. Kilbourne's injury-related records, Mr. Kilbourne has presented no evidence to suggest that Mr. Bryant accessed or became aware of those records shortly before the investigation or at a time that is otherwise suspicious. Second, a significant intervening event occurred between the conversation involving Mr. Kilbourne and Mr. Joyce and Mr. Joyce's knowledge of or participation in the residency investigation and ultimate termination. Mr. Kilbourne has presented no evidence to contradict the fact that by the time Mr. Joyce became aware of or in any way involved in the investigation, Mr. Bryant had already received the anonymous tip, investigated, and, along with

Ms. Lockard, concluded that Mr. Kilbourne did not live in Marion County.  Accordingly, the timing of the conversation does not give rise to any reasonable inference of causation.

Mr. Kilbourne also points to people who he asserts were similarly situated but treated differently.  Specifically, he asserts that Mr. Graham, Mr. Addair, and Ms. Brown were asked to provide only their driver's license and voter registration cards as proof of their residence, while those documents were not sufficient to prove his own residence.  However, Mr. Kilbourne has not pointed to any evidence—apart from the fact that these other employees were also investigated for their residency—that these individuals are similarly situated.  "[T]he similarly-situated inquiry is flexible, common-sense, and factual," and asks whether there are enough commonalities between individuals to permit a meaningful comparison. *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012).  Here, however, there are no such commonalities, because the evidence shows that Mr. Kilbourne's situation was unique: the City was faced with evidence that Mr. Kilbourne owned the Mooresville House and may have resided there, while it also had evidence to suggest that the Milhouse Property was uninhabited, and there is no evidence that this was the case for any of the proposed comparators.  The record says nothing about whether Mr. Graham or Mr. Addair owned property outside Marion County for which they claimed a homestead exemption or whether their claimed in-county addresses were believed to be vacant.  Indeed, Mr. Bryant stated that Mr. Kilbourne's was the only residency investigation he had seen with these particular circumstances. [Filing No. 60-2 at 6.]  Furthermore, Mr. Kilbourne also points to the fact that, in 2016, he was permitted to establish residency using his driver's license and voter registration card.  But this contradicts, rather than supports, his assertion that he was treated differently.  Indeed, his driver's license and voter registration card were sufficient—just like Mr. Graham's and Mr. Addair's—until the City obtained information casting doubt on whether Mr. Kilbourne in fact lived at the address

listed on those documents. Accordingly, the circumstances were different enough that a meaningful comparison cannot be made between Mr. Kilbourne and these other employees. The same is true for Mr. Kilbourne's replacement, Mr. Vega, because although he was not disabled and had never used or intended to use FMLA leave, there is no evidence to suggest that he was being investigated for his residency or that the City believed he lived outside of Marion County. *See King*, 872 F.3d at 842 (concluding that, where a plaintiff does not show that others were similarly situated, "any different treatment of those employees offers no support for a finding that [the employer's] treatment of [the plaintiff] was retaliatory").

Relatedly, the fact that the City required additional proof following its August 2017 investigation than it did following the February 2016 investigation does not constitute an ambiguous or shifting standard and is not evidence of causation or pretext. The circumstances had changed drastically between the two investigations. Not only was August 2017 the second time that the City was investigating allegations that Mr. Kilbourne lived in Mooresville, but during that investigation, the City had new information casting doubt on the validity of the address listed on Mr. Kilbourne's driver's license and voter registration card—Mr. Bryant's observations and photographs of the Milhouse Property, the BNS records, and the property tax records. It is true that Mr. Kilbourne also injured his knee and engaged in the resulting protected activity during this intervening time, but again, Mr. Kilbourne has presented no evidence from which a factfinder could infer that this injury or activity caused the second investigation or his termination.

The other major focus of Mr. Kilbourne's argument is his assertion that the City was incorrect in determining that he lived at the Mooresville House and not on the Milhouse Property, which in turn, he argues, shows that the offered reason for his termination was pretext. Importantly, however, whether the City was correct in its determination is not the issue. Courts in

this Circuit have "long championed an employer's right to make its own business decisions, even if they are wrong or bad.  Therefore, regardless of whether it is correct in its beliefs, if an employer acted in good faith and with an honest belief, [a court] will not second-guess its decisions." *Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 899 (7th Cir. 1999).  The City asserts that Mr. Kilbourne was terminated because he violated the Ordinance.  Mr. Kilbourne maintains that he actually lived on the Milhouse Property and therefore did not violate the Ordinance.  A factual dispute remains as to where Mr. Kilbourne lived, but that dispute is not material to the outcome of this case, because Mr. Kilbourne has presented no evidence from which a factfinder could infer that the individuals responsible for terminating him did not have an honest, good faith belief that he did not live in Marion County, even if they were incorrect in that belief.  *See Green*, 197 F.3d at 899 ("Even assuming, for the sake of argument, that there are legitimate factual disputes as to whether [a plaintiff] engaged in the behaviors for which [his employer] claims [he] was terminated, [the plaintiff] can only prevail . . . if [he] demonstrates that [his employer] did not in good faith believe the reasons it provided for discharging [him].").

Mr. Kilbourne makes another meritless claim that the City's belief was not honestly held in his argument that it was against Indiana law for City employees to view the property tax records for the homestead deduction on the Mooresville House, and therefore they could not rely upon those records in support of their termination decision.  However, this argument misses the point.  Mr. Kilbourne has not pointed to any legal authority stating that property tax records are confidential.  The only provision he points to establishes limited access for county auditors to a "homestead property data base that includes access to the homestead owner's name and the numbers required from the homestead owner [including social security number, driver's license number, etc.] for the sole purpose of verifying whether an owner is wrongly claiming a deduction."

Ind. Code § 6-1.1-12-37(i).  Regardless, the undisputed evidence shows that the City employees believed they could and regularly did access such records.  And, even if the homestead deduction records are disregarded, Mr. Kilbourne has not presented evidence to show that the City employees' reliance on the other evidence—including their perception that the Milhouse Property was uninhabited and was the only address where Mr. Kilbourne claimed to reside—was not in good faith.

As to Mr. Kilbourne's arguments that the homestead deduction claimed on the Mooresville House and the other evidence concerning the structures on the Milhouse Property did not prove that he did not live in a motorhome on the Milhouse Property, the Court again emphasizes that the City employees did not have to be correct in their beliefs, they need only have honestly held such beliefs and acted upon them, rather than upon retaliatory or discriminatory animus.  Mr. Kilbourne has not pointed to evidence of suspicious timing, similarly situated comparators who were treated differently, ambiguous statements, or anything else evidencing discriminatory or retaliatory intent.  See King, 872 F.3d at 842 ("Even assuming that the [proffered explanation] was not the real reason for [the plaintiff's] firing, [the plaintiff] would still need to offer some reason to infer that retaliation was the reason. However, [he] offers no suspicious timing, no comparator evidence, and . . . no comments by decisionmakers in reference to any of [his] or anyone else's protected activities that could suggest a retaliatory animus. Thus, even if [he] could show that the [proffered reason] was a pretext, there is no evidence from which a jury could find that it was a pretext for retaliation . . . . That missing link is fatal to [his] claims.").

In sum, there is no evidence from which a rational factfinder could conclude that the City's proffered reason for Mr. Kilbourne's termination was not honestly held, and it is undisputed that violation of the Ordinance is sufficient to justify an employee's termination.  In the absence of such

evidence, there is nothing that could give rise to a reasonable inference of discriminatory or retaliatory intent related to Mr. Kilbourne's disability or request for FMLA leave, and the City's Motion for Summary Judgment must be granted as to Mr. Kilbourne's claims for retaliation under the FMLA and ADA and discrimination under the ADA.

### D. *Frampton* Claim

Generally, Courts in this Circuit apply "the sensible presumption that if the federal claims drop out before trial, the district court should relinquish jurisdiction over the state-law claims." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007) (citations and emphasis omitted). However, this is merely "a presumption and not a rule," *id.*, and the Court must balance "the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction," *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Supplemental jurisdiction may be retained if "substantial federal judicial resources have already been expended on the resolution of the supplemental claims" or if "it is obvious how the [supplemental] claims should be decided." *Williams*, 479 F.3d 904 at 907.

The Court finds that the exercise of supplemental jurisdiction over Mr. Kilbourne's *Frampton* claim is proper in this case. The parties and the Court have already expended substantial resources conducting discovery and litigating the claim through the summary judgment stage. More importantly, given the similarities between the *Frampton* claim and the federal claims, discussed further below, it is obvious how the *Frampton* claim should be decided. The interests of judicial economy, convenience, and fairness would not be served by allowing the parties to re-litigate this claim from the beginning in state court.

In support of its Summary Judgment Motion, the City argues that Mr. Kilbourne's *Frampton* claim is "based purely on speculation"  as there is no evidence that any decisionmaker

knew about his worker's compensation claims or that such claims caused his termination.  [Filing No. 62 at 22-24.]  The City further argues that it has a legitimate, non-discriminatory basis for terminating Mr. Kilbourne—his violation of the Ordinance—and there is no evidence upon which a jury could conclude that such reason is pretextual.  [Filing No. 62 at 24-25.]

In response, Mr. Kilbourne makes the same arguments concerning his *Frampton* claim that he did in support of his federal claims.  [Filing No. 75 at 14-25.]  Specifically, he argues that he filed a worker's compensation claim related to his November 2016 knee injury and received benefits, that he told Mr. Joyce about this and Ms. Lockard would have known because records of the injury were submitted to the HR department, and that issues of material fact remain as to whether he was fired in retaliation for filing this claim and whether the offered reason for his termination was pretext.  [Filing No. 75 at 14-25.]

In reply, the City maintains that Mr. Kilbourne has provided no evidence that any of the decisionmakers knew about his worker's compensation claim and, even if they did, it occurred too long before his termination to raise an inference of retaliation.  [Filing No. 76 at 10-11.]

"To survive summary judgment on a *Frampton* claim, the plaintiff must present evidence that would support a finding that the discharge was caused by his filing for benefits."  *Smeigh v. Johns Manville, Inc.*, 643 F.3d 554, 560 (7th Cir. 2011) (citation omitted).  "A successful litigant must demonstrate that his discharge was solely in retaliation for the exercise of a statutory right, meaning that any and all reasons for the discharge must be unlawful in order to sustain a claim."  *Id.* (citing *Purdy v. Wright Tree Serv., Inc.*, 835 N.E.2d 209, 212 (Ind. Ct. App. 2005)).

Similar to the *McDonnell Douglas* framework, Indiana courts have "outlined and consistently followed a three-step approach to a retaliatory discharge *Frampton* claim under

Indiana law." *Best Formed Plastics, LLC v. Shoun*, 51 N.E.3d 345, 351 (Ind. Ct. App. 2016).  The

approach is as follows:

> First, the employee must prove, by a preponderance of the evidence, a prima facie case of discrimination.  Specifically, the employee must present evidence that directly or indirectly implies the necessary inference of causation between the filing of a worker's compensation claim and the termination.  Second, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the discharge.  If the employer carries its burden, the employee then has the opportunity to prove that the reason cited by the employer is a pretext.  He may establish pretext by showing that the reasons are (1) factually baseless; (2) not the actual motivation for his discharge; or (3) insufficient to motivate the discharge.

*Id.* (internal citations omitted).

Mr. Kilbourne's *Frampton* claim fails for the same reasons his federal claims fail.  Again,

drawing all reasonable inferences in Mr. Kilbourne's favor, a factfinder could conclude that Mr.

Bryant or Ms. Lockard, due to their positions in the HR department, were aware that Mr. Kilbourne

filed a worker's compensation claim and was awarded benefits.  However, neither the filing of the

claim nor the award of benefits was close in time to Mr. Kilbourne's termination, which followed

an independent intervening event (*i.e.*, the anonymous tip that Mr. Kilbourne lived in Mooresville

and the subsequent investigation into the issue).  Furthermore, for the reasons discussed above, the

Court does not credit Mr. Kilbourne's statement in his affidavit that he informed Mr. Joyce of his

on-the-job injury, leave, or worker's compensation claim a week before the termination.  Mr.

Kilbourne points to no evidence that any other individuals who did not file worker's compensation

claims but were also thought to be living outside the county were treated differently.

In sum, Mr. Kilbourne did not present any "evidence that directly or indirectly implies the

necessary inference of causation between the filing of a worker's compensation claim and the

termination," or that shows that the City's conclusion that he violated the Ordinance was

"(1) factually baseless; (2) not the actual motivation for his discharge; or (3) insufficient to

motivate the discharge." *See Best Formed Plastics*, 51 N.E.3d at 351.   Given that a reasonable

factfinder could not conclude, based on the evidence presented, that the termination was solely in

retaliation for the worker's compensation claim, Mr. Kilbourne cannot sustain a *Frampton* claim

and the City's Motion for Summary Judgment must be granted.   *See Smeigh*, 643 F.3d at 560;

*Purdy*, 835 N.E.2d at 212.

## IV.
### CONCLUSION

Based on the foregoing, the City's Motion for Summary Judgment, [59], is **GRANTED** as

to all of Mr. Kilbourne's claims.   Final judgment shall issue accordingly.


Date: 5/20/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana


**Distribution via ECF only to all counsel of record**